UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Gerald R. Hess

     v.                             Civil No. 04-cv-110-JD
                                      Opinion No. 2005 DNH 143
Rochester School District, et al.

O R D E R

    Gerald R. Hess, appearing pro se, has sued his former
employer, the Rochester School District, alleging violations of
the Americans with Disabilities Act ("ADA"), the Family and
Medical Leave Act ("FMLA"), and state law, arising from the
termination of his employment as a teacher at the Rochester
Middle School.[1]  Hess contends that his teaching contract was not
renewed because of his impairments caused by Attention Deficit
Hyperactivity Disorder ("ADHD") and anxiety.  The District moves
to dismiss five of the counts in Hess's complaint and moves for
summary judgment on the remaining thirteen counts.  Hess has

_____

    [1]Although Hess also names Superintendent Raymond Yeagley,
and Principal Walter Helliesen, as parties, he has sued them in
their official capacities only, meaning that his claims are
brought against the governmental entity, the Rochester School
District.  See Wood v. Hancock County Sheriff's Dep't, 354 F.3d
57, 58 n.1 (1st Cir. 2003).  In addition, although neither the
First Circuit nor the Supreme Court has decided the question,
this district follows the majority rule that the ADA does not
impose individual liability.  See Lee v. Trs. of Dartmouth Coll.,
958 F. Supp. 37, 45 (D.N.H. 1997).

agreed to dismiss four of his claims but otherwise opposes the
District's motions.

I.  <u>Motion to Dismiss</u>

     Because the District has filed its answer to Hess's
complaint, the motion is properly considered as a motion for
judgment on the pleadings.  <u>See</u> Fed. R. Civ. P. 12(c).  The
standard for considering a motion for judgment on the pleadings
is essentially the same as for a motion to dismiss.  <u>Pasdon v.
City of Peabody</u>, 417 F.3d 225, 226 (1st Cir. 2005).  When
considering a motion for judgment on the pleadings, the "court
must accept all of the nonmoving party's well-pleaded factual
averments as true and draw all reasonable inferences in her
favor."  <u>Feliciano v. Rhode Island</u>, 160 F.3d 780, 788 (1st Cir.
1998).  Judgment on the pleadings is not appropriate "'unless it
appears beyond doubt that the plaintiff can prove no set of facts
in support of her claim which would entitle her to relief.'"
<u>Santiago de Castro v. Morales Medina</u>, 943 F.2d 129, 130 (1st Cir.
1991) (quoting <u>Rivera-Gomez v. De Castro</u>, 843 F.2d 631, 635 (1st
Cir. 1988)).

     In Count 15, Hess alleges a claim of wrongful termination
under New Hampshire Revised Statutes Annotated ("RSA") § 189:14-
a,III.  The District contends that this court lacks jurisdiction

2

to hear a claim under RSA 189:14-a,III.  Hess responds that he does not understand the District's motion.

RSA 189:14 states the process to be followed when a teacher with certain credentials is not renominated to his position but does not include a right of review in this or any other court.[2] Instead, RSA 189:14-b provides for review of the local school board's decision by the state board of education.  Further, "the decision of the state board shall be final and binding upon both parties."  RSA 189:14-b.  Notwithstanding the finality provision, the state board of education's decision may be reviewed by the New Hampshire Supreme Court which "will grant certiorari and

---

[2]   RSA 189:14-a,III provides:

> In cases of nonrenomination because of unsatisfactory performance, the superintendent of the local school district shall demonstrate, at the school board hearing, by a preponderance of the evidence, that the teacher had received written notice that the teacher's unsatisfactory performance may lead to nonrenomination, that the teacher had a reasonable opportunity to correct such unsatisfactory performance, and that the teacher had failed to correct such unsatisfactory performance.  Nothing in this paragraph shall be construed to require the superintendent or the school board to provide a teacher with remedial assistance to correct any deficiencies that form the basis for such teacher's nonrenomination.

reverse the decision of an agency such as the State Board where it exceeded its jurisdiction or authority, otherwise acted illegally, abused its discretion or acted arbitrarily, unreasonably, or capriciously."  Petition of Dunlap, 134 N.H. 533, 538 (1991) (internal quotation marks omitted).

The statutory process and review by the supreme court do not provide a cause of action in this court under RSA 189:14-a.  See, e.g., Thomas v. Contoocook Valley Sch. Dist., 150 F.3d 31, 42-43 (1st Cir. 1998) (discussing state procedure in contrast to federal claim).  Therefore, the District is entitled to judgment on the pleadings on Count 15.  The District is also entitled to judgment on the pleadings on Counts 9, 10, 13, and 16 as acknowledged by Hess in his response to the District's motion.

II.  Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party

opposing a properly supported motion for summary judgment must
present competent evidence of record that shows a genuine issue
for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986).  All reasonable inferences and all credibility issues
are resolved in favor of the nonmoving party.  See id. at 255.

## Background

Gerald Hess was first employed by the Rochester School
District for the 1986–1987 school year.  He taught computer
education at Rochester Middle School from 1986 through the 2000
to 2001 school year.  He was successful in that position during
the tenure of the previous principal and assistant principal.

Hess was diagnosed with Attention Deficit Disorder ("ADD")
in 1995, and he was diagnosed with ADHD and anxiety in 2000.  He
began treating with a psychiatrist, Doris Citron, in September of
2000.  Both Rochester Middle School Principal Helliesen and
Superintendent Yeagley were aware of Hess's ADD diagnosis.  Dr.
Citron states that Hess's ADHD and anxiety cause inattention,
hyperactivity, and impulsivity, impair his ability to learn new
aspects of computer teaching without assistance, and cause him to
be very forgetful.

In the fall of 2001, Hess was moved to the Structured
Thought and Review Subjects ("STARS") program, where he worked

with students who had failed a class the previous year and were required to attend the program for additional assistance.  During a meeting with Helliesen on January 11, 2002, Hess complained that if he had too many students, there would be too many behavior problems in his class.  Hess states that on January 28, 2002, he gave a letter to Helliesen in which he asked the school to buy computer software to help him handle hyperactive students and asked that no additional hyperactive students be assigned to his class.  He characterizes those requests as an accommodation for his disability.  He states that his requests were denied or ignored.

In the spring of 2002, Hess was also teaching a computer class along with his STARS classes.  One day in April of 2002 Helliesen learned that Hess had left his computer class unsupervised, and when he went to the classroom, he found no teacher.  Helliesen made an "all call" announcement on the intercom system, summoning Hess back to the classroom.  Hess returned in response to the call.  Hess explains that he thought the class would be away on a field trip that day based on the school's attendance slip and that he went to another classroom to prepare an activity for a later class.  Hess believes that Helliesen accepted his explanation because he was not reprimanded for that incident.

On May 7, 2002, Hess requested in writing that Helliesen move him back to teaching computer education because he was discouraged by the lack of progress made by the STARS students and he was "burned out" by the work load and his attention deficit disorder.  Helliesen explained that Hess could not return to computer education because his position had been eliminated.

Hess continued with the STARS program.  At the beginning of the school year in September of 2002, Hess's classroom was prepared for installation of ten computers, and while he waited for the installation, Hess used the computer lab almost every day.  During October of 2002, Hess started an after school program in which he used computers, Nintendo, and music with students.  He asked for money from the school to buy two CD players, but his request was denied.  In December, Hess was told that the computers would not be installed in his classroom, and the rules for computer lab use were changed, making it less available for him to use with his STARS students.  Hess requested computers for his classroom and asked to have students use Nintendo games and head phones to listen to music during class.  Hess characterizes these requests as an aid to him in the class room to quiet disruptive students.

On October 25, Hess left three sixth grade girls and two eighth grade boys unsupervised in his classroom for approximately

7

twenty minutes.  While they were there, the girls became
concerned for their safety because of comments made by the boys.
A student found Helliesen in the hallway and asked where Hess had
gone.  Helliesen found the unsupervised students in the classroom
who told him that Hess had gone to another classroom in another
wing of the school.  Hess returned when Helliesen summoned him
through the intercom system.

Hess provided a written explanation for that incident.  He
wrote that earlier that morning he had worked with the two eighth
grade boys who were having behavior and learning problems and was
excited to find that they had relaxed and gained trust when he
let them play Nintendo and talked with them while they played.
The boys went back to their classroom, and he told them they
could come back when they finished their work.  The three sixth
grade girls arrived for their STARS period, and then the boys
returned.  Hess stated that he "was so excited about finding out
how to help the boys, the teacher, and everyone involved in their
lives that [he] wanted to tell the Special Ed teacher what she
could do during the rest of the day to continue the positive
behavior."  Def. Ex. B at 2.  Hess gave the girls "free time" and
thought the boys were engrossed in Nintendo so that he could
leave them to talk with the Special Ed teacher.  He explained
that he lost track of time but that when he returned the boys

8

were still playing Nintendo and the girls were gone so everything seemed to be fine.  Several days later he realized that the reason that incident occurred was because he had stopped taking his antidepressant medication for three weeks.  Despite Hess's explanation, Superintendent Yeagley issued a written reprimand to Hess on October 28, 2002.  Helliesen told Hess that he could no longer use Nintendo in his classroom.

Helliesen states in his affidavit that on November 7, 2002, Hess left his entire class in the hallway outside of his classroom without asking another teacher to supervise the students.  One of the students was injured while the group was left unsupervised in the hallway and was seen by the school nurse.  The nurse reported the incident to Helliesen.  Hess disputes that this incident ever occurred, and no reprimand resulted from it.

Hess left a student unsupervised in the classroom working on a computer on December 20, 2002.  While Hess was gone, another student, who had been assigned to his class while her class was away on a field trip, came into the classroom and joined the first student at the computer.  Together the two students attempted approximately twenty-five times to access pornographic sites on the Internet.  The school's Computer Information Center notified Helliesen that the computer was being used to attempt

access to pornographic sites.  Helliesen went to Hess's classroom
and found the two students there, unsupervised.  After moving
them away from the computer, he checked the Internet history and
found attempts to access blocked sites.  The students said that
Hess was in another room across the hall.  On his return, Hess
admitted leaving the first student unsupervised.  Helliesen
recommended that Hess be suspended for five days because of his
repeated failures to properly supervise his students, and Yeagley
issued the suspension on January 3, 2003.

     Hess returned from the suspension on January 21, 2003.  Two
days later, a female student reported to Helliesen that Hess
slapped her in the face during class because she was laughing
loudly.  Helliesen met with Hess who agreed with the student's
version of events except that he said he had not slapped her but
had only "cupped" his hands along her face to get her attention.
The Assistant Superintendent interviewed Hess with a
representative of the Rochester Teachers Union present.  Hess
admitted cupping the student's face but explained he was trying
to quiet her because she had a very loud voice that hurt his ears
and startled him.  Hess was suspended, with pay, pending the
completion of the investigation.  A disruptive student, whom Hess
had sent to the office on several occasions in December, was
removed from the STARS class before Hess's replacement took over

the class.

On February 2, 2003, Yeagley notified Hess by letter that he was suspended from his teaching position indefinitely, without pay, and informed him of the further proceedings that would occur.  The letter also reviewed the incidents from the past fall and stated that his "failure to appropriately supervise students under [his] care has directly or indirectly resulted in injury, harassment or fear of harassment, and student discipline that could probably have been avoided had you carried out your responsibilities adequately."  Def. Ex. F.  Yeagley warned Hess that if the investigation substantiated the student's charge that he touched her "in a manner that was unwelcome, such an action would be further substantiation of your lack of ability to adequately and appropriately supervise students in accordance with the standards expected of professional teachers."  Id.

Yeagley notified Hess on March 11, 2003, that he intended to recommend that his teaching contract not be renewed for the next year.  Hess requested a ninety-day unpaid leave of absence which was approved the next day.  Yeagley sent Hess a letter on March 25, 2005, that further explained the reasons for recommending nonrenewal.  On May 15, 2003, the School Board held a hearing to consider Yeagley's recommendation for nonrenewal of Hess's contract.  Dr. Citron, Helliesen, and Yeagley testified.  Dr.

11

Citron testified that Hess required accommodations to do his job,
that is, that he should be allowed to have his students play
Nintendo games and listen to music with headphones during class
to reduce student disruptive behavior that increases Hess's
"distractiveness" due to his ADHD and anxiety.

The Board accepted Yeagley's recommendation that Hess's
contract not be renewed on June 3, 2003.  Hess filed a claim with
the New Hampshire Human Rights Commission on October 15, 2003,
claiming discrimination due to his disability and retaliation
beginning on September 2, 2002.  He received a right to sue
notice on December 24, 2003, and filed suit in March of 2004.

### A.  ADA Claims

Counts 1 through 7 in the complaint raise claims under the
ADA.  Hess alleges that the District treated him differently,
denied him reasonable accommodations, terminated him because of
his disability or because of a stereotype of his disability,
refused to engage in an interactive process with him, and
retaliated against him for requesting reasonable accommodation,
all in violation of the ADA.  The District moves for summary
judgment on the grounds that some of Hess's claims are barred as
untimely or because he failed to exhaust administrative remedies
and that, as to the remaining claims, he cannot prove

12

discrimination or retaliation in violation of the ADA.

### 1.  Exhaustion of administrative remedies and timeliness.

Before bringing an ADA claim in this court, a plaintiff must exhaust his administrative remedies by bringing the claim before the Equal Employment Opportunity Commission ("EEOC") or the appropriate state agency within the time allowed.  Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999). When, as here, the plaintiff brings his claim to a state agency, the claim must be brought within 300 days after the alleged discrimination occurred.  Id. (citing 42 U.S.C. § 2000e-5(e)). An unexcused failure to exhaust administrative remedies bars those claims from being considered here.  Id.

The District contends that Hess's disparate treatment claim in Count 1 was not included in his EEOC complaint and is also time-barred.  Hess alleges in Count 1 that the District treated him "differently than other non-disabled employees by failing to provide him with the same training, equipment, help in obtaining 'computer teacher' certification and resources as other similarly situated employees; consequently [his] position as a computer teacher was eliminated and, eventually, [he] was terminated." Am. Comp. ¶ 30.  Hess also alleges that the disparate treatment

occurred between March of 1997 and June of 2001.  Id. ¶ 16.  That claim is not included in his EEOC complaint, which is limited to the period between September of 2002 and June of 2003.

In response, Hess explains that he sent a 125-page report to the EEOC on September 8, 2003, and did not receive a response until he enlisted help from Representative Bradley's office. Then, on October 15, 2003, Ben Nidus from the EEOC called Hess and asked him questions about his complaint.  A completed complaint form, which stated claims for discrimination based on disability and retaliation between September 2, 2002, and June 3, 2003, based on a five-paragraph description of the circumstances, was sent to Hess with the instruction that he had thirty-three days to return it.  On November 19, 2003, when only three days were left to return the complaint, Nidus called to tell Hess to send back the complaint or his charge would be dismissed and that he could add other charges to his complaint later.  Hess sent in the complaint as it had been drafted for him.  A month later he sent Nidus a letter saying that he planned to send more information.  On December 24, 2003, Hess received a notice of dismissal of his complaint and of his right to sue.  Although Hess appealed that decision, he did not include in the record here copies of his submissions to the EEOC in support of his request for reconsideration.

14

Hess's claims based on events and circumstances between 1997 and 2001, which are the basis for Hess's claim in Count 1, were barred by the 300 day limit when he filed his complaint.  The only claims that have been administratively exhausted are the claims stated in the EEOC complaint.  The record does not support any grounds for excusing his failure to exhaust additional claims or to timely file a complaint stating those claims.  See Bonilla, 194 F.3d at 278-79.

### 2.  ADA discrimination.

The District contends that it terminated Hess's employment not because he had been diagnosed with ADHD and anxiety but because he was not able to perform the essential functions of his teaching position:  teaching and supervising students.  Hess argues that he was qualified as a teacher and would have been able to properly supervise his students if he had been provided with the reasonable accommodation of letting his students play Nintendo and computer games and listen to music with headphones during class.  Hess asserts that those "Child Diversity Tools" would have alleviated his stress caused by the excessively disruptive students in his class and that a reduction in stress would have prevented the negative effects of his ADHD which led to the incidents for which he was terminated.

15

"The ADA prohibits discrimination against 'a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment.'"  Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 63 (1st Cir. 2004) (quoting 42 U.S.C. § 12112(a)).  To establish disability discrimination under the ADA a plaintiff must show:  "(1) that he suffers from a disability; (2) that he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) that [the defendant] took adverse action against him because of his disability."  Wright v. CompUSA, Inc., 352 F.3d 472, 475 (1st Cir. 2003).

### a.  Disability.

In the ADA context, "[h]aving a 'disability' means having or being 'regarded as' having a mental or physical impairment that 'substantially limits one or more . . . major life activities.'"[3] Guzman-Rosario v. U.P.S., 397 F.3d 6, 9 (1st Cir. 2005) (quoting 42 U.S.C. § 12102(2)(A),(C)).  An ADD or ADHD diagnosis is not sufficient to establish a disability under the ADA.  Wright, 352

---

[3]The "regarded as" part of the statute is the basis for Hess's claim in Count 4 that the District discriminated against him based on its perception of his inability to properly supervise his students.

F.3d at 476-77; <u>Calef v. Gillette Co.</u>, 322 F.3d 75, 83 (1st Cir.

2003).  A plaintiff claiming a disability based on such a

diagnosis must also show a substantial limitation of a major life

activity.  <u>Wright</u>, 352 F.3d at 477.  Both working and learning

are considered major life activities within this context.[4]  29

C.F.R. § 1630.2(i).  A plaintiff's impairment is considered on a

case-by-case basis in the context of his own experience.  <u>Toyota</u>

<u>Motor Mfg., Inc. v. Williams</u>, 534 U.S. 184, 198 (2002).

The impact of an impairment such as ADD or ADHD is assessed

based on the plaintiff's abilities when he is receiving proper

counseling and medication.  <u>Calef</u>, 322 F.3d at 83.  The record

indicates that during the school year 2002 to 2003, Hess was not

being properly medicated.  He stated in his explanation for the

October 25, 2002, incident that it occurred because he had

stopped taking the medication prescribed by his psychiatrist, Dr.

Citron.  Information provided by Hess's primary care physician,

Dr. Mathes, and Dr. Citron indicates that his then current

medications were not entirely effective and that other medication

would have been more appropriate.  Therefore, as a preliminary

matter, Hess has not shown that when he is properly medicated for

---

[4]While working is assumed to be a major life activity under
the ADA, the First Circuit has noted the inherent difficulties of
an analysis based on work disability.  <u>See</u> <u>Sullivan v. Neiman</u>
<u>Marcus Group, Inc.</u>, 358 F.3d 110, 115-16 (1st Cir. 2004).

ADD or ADHD he nevertheless is substantially limited in a major
life function such as working or learning.

### i.  Working.

Hess contends that he is disabled because his impairments
have caused substantial problems in his work as a teacher.  In
particular, Hess contends that his impairments make it difficult
for him to cope with disruptive students because the stress of
their disruptive behavior or his anticipation of disruption
causes him pain that makes him act impulsively.  "[A] plaintiff
is 'disabled' even if [he] can still work but if [he] is
significantly restricted in or precluded from performing either a
'class' of jobs––a set of jobs utilizing similar skills,
knowledge, and training to her prior job––or a 'broad range' of
jobs in various classes––a large set of jobs that vary in what
skills are required."  Guzman–Rosario, 397 F.3d at 10–11 (quoting
§ 1630.2(j)(3)(ii)– (iii)).

As is noted above, Hess has not shown that he is
significantly impaired when he is properly medicated.  In
addition, over his long career in teaching, when he presumably
encountered disruptive students on a regular basis and while he
also was coping with the effects of ADHD and anxiety, he did not
experience the problems that occurred during the 2002 to 2003

18

school year.  He argues that he had avoided problems during his
career because he was allowed to use "Child Diversity Tools,"
such as computers, Nintendo games, and music, to control
disruptive students.

During the fall of 2002, when several of the incidents
occurred that led to his termination, however, Hess was using
"Child Diversity Tools," and, in fact, students were playing
Nintendo and using a computer when he left them unsupervised
during the challenged incidents.  After the October 25, 2002,
incident, Hess explained that his excitement over his success
with two disruptive students, not pain caused by the stress of
disruptive students or his disability, caused him to leave the
class unsupervised.  Therefore, based on Hess's own experience in
the workplace, he has not shown that a triable issue exists as to
whether his impairment restricted or precluded him from working
as a teacher.

### ii.  Learning.

Hess contends that he is substantially limited in his
ability to learn by ADHD and anxiety because he fails to attend
to detail, has difficulty in sustaining attention, and does not
listen, follow through, or complete tasks.  He also states that
he has problems with organization, sustaining mental energy,

distractibility, and memory.  Hess further contends that his
symptoms of hyperactivity interfere with his ability to learn.
He states that while he is able to learn, the process requires
more time and effort from him than for non-disabled individuals.

Despite his disability, Hess completed secondary school,
college, a master's degree, and other post-graduate work.  Hess
also stated that he has received "A" grades in computer and
administration courses that he has taken.  Although Hess
describes problems that he has experienced in school and in jobs,
which he ascribes to an impaired ability to learn due to ADHD and
anxiety, the results of his efforts shown by his life experiences
undercut any evidence of a significant impairment in his ability
to learn.  See, e.g., Calef, 322 F.3d at 84.

### iii.  Regarded as disabled.

Hess argues that the District also regarded him as disabled.
The ADA protects an employee from discrimination based on the
employer's mistaken impression that he is disabled.  Sullivan,
358 F.3d at 117.  An employee proves this claim by showing that
his employer either mistakenly believed that he had an impairment
that substantially limited one or more major life activities or
his employer mistakenly believed that the employee's actual but
non-limiting impairment did limit one or more major life

20

activities.  <u>Id.</u> at 117 (citing <u>Sutton v. United Airlines, Inc.</u>, 527 U.S. 471, 489 (1999)).

Hess misunderstands the standard for a "regarded as" claim. Instead of showing that the District <u>mistakenly</u> believed he had an impairment or was disabled by an actual impairment, he shows only that the District recognized that he had been diagnosed with ADD and ADHD.  Hess has not shown or even suggested that the District <u>mistakenly</u> thought he had been diagnosed or <u>mistakenly</u> thought he was impaired when he was not.

Because Hess has not provided sufficient evidence to show a disputed factual issue on the question of whether he has a disability within the meaning of the ADA, the District is entitled to summary judgment on his ADA claims.  In addition, even if Hess were able to show a trialworthy issue as to disability, he cannot sustain his burden on the issue of whether he was a qualified individual under the ADA.

<u>b. Qualified individual.</u>

To make a claim under the ADA, a plaintiff must show that he is a "qualified individual," meaning that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  <u>Sullivan</u>, 358 F.3d at

21

115 (quoting and citing 42 U.S.C. § 12112(a) & § 12111(8)).  To
avoid summary judgment on the issue of whether a plaintiff is a
qualified individual under the ADA, he "must produce enough
evidence for a reasonable jury to find that (1) he is disabled
within the meaning of the ADA, (2) he was able to perform the
essential functions of the job with or without a reasonable
accommodation, and (3) [his employer], despite knowing of [his]
disability, did not reasonably accommodate it."  Rocafort v. IBM
Corp., 334 F.3d 115, 119 (1st Cir. 2003).  The employer's
judgment as to what constitutes an essential job function is to
be given consideration.  § 12111(8); Calef, 322 F.3d at 86.

     Based on the affidavit of Principal Helliesen, the District
states that "the duty to properly supervise students is an
essential function of any teacher's job.  Proper supervision is
essential to ensure that students are not allowed to be in
dangerous or potentially dangerous situation [sic] while at
school."  Def. Ex. 1 ¶ 17.  The District further contends that
"disruptions, whether from students, loud bells, announcements or
other sources is [sic] part of doing the job.  It is essential
that teachers be able to teach despite disruptions.  Mr. Hess'
strategy of using computer games and Nintendo to pacify students
is not teaching."  Def. Ex. 1 ¶ 18.

     In response, Hess argues that he had effectively used

22

Nintendo and computer games to control disruptive students in the
past.  He contends that when students are permitted to play those
games, he is able to properly supervise them.  He provides
testimonials from other teachers and a student that students were
less disruptive when they were permitted to use computer games
and Nintendo during class.  The student reported that Hess
allowed the class to listen to music "for the whole day" and that
one disruptive student "totally stopped disrupting when he
started to use the headphones.  The music/gum chewing took out a
lot of the back and forth chitter chatter between several boys
and girls in the class."  Pl. Ex. 35.  A math teacher reported
that when Hess tried his "Child Diversity Tools" in her
classroom, the behavior improved because they were listening to
music instead of to the teacher, that the class's written work
output improved, and that using the music as a reward for ADHD
students appeared to be a useful tool.  Pl. Ex. 18.  A reading
teacher who had worked in the STARS program said she used
headphones with some students limited to times when they were
writing and when she was not giving instructions but that she did
not have problems with disruptive students and did not use
Nintendo or other computer games.  A shop teacher said that he
and Hess used headphones with a few students during an after
school detention that seemed to help them.  A special education

teacher who had taught with Hess in Stamford, Connecticut, prior
to 1986, stated in a letter that he had successfully used Hess's
suggestion of having students listen to music in class.

Hess contends that his "Child Diversity Tools" were
reasonable accommodations that would have permitted him to
properly supervise his classes.  Hess ignores the District's
requirement that he teach the students rather than pacify them by
allowing them to listen to music and play games for as much as
half of their class time.  He also ignores the District's
decision that letting students play games and listen to music for
purposes of pacifying them is not teaching.  Contrary to Hess's
view of the impact of the ADA, "an employer is under no
obligation to modify an essential job function to accommodate a
disabled employee."  Calef, 322 F.3d at 86 n.8.  Further, as is
noted above, several of the incidents when Hess left his students
without supervision occurred while students were using Nintendo
and computers, demonstrating that the accommodations he requests
were not effective with respect to controlling Hess's
impairments.  "Put simply, the ADA does not require that an
employee whose unacceptable behavior threatens the safety of
others be retained, even if the behavior stems from a mental
disability."  Id. at 87.

Therefore, the District is entitled to summary judgment on Hess's ADA discrimination claims, Counts 2 through 6.

### 3.  ADA retaliation.

In Count 7, Hess alleges that the District retaliated against him because of his requests for accommodation of his ADHD and anxiety.  The ADA provides:  "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  A plaintiff's failure to succeed on an ADA discrimination claim does not preclude his ADA retaliation claim.  Wright, 352 F.3d 477.  For an ADA retaliation claim, a plaintiff "must establish that (1) he engaged in protected conduct, (2) he suffered adverse employment action, and (3) there was a causal connection between his conduct and the adverse action."  Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 177 (1st Cir. 2003).  If a plaintiff can satisfy the three elements of retaliation, the inquiry shifts to the defendant to articulate a legitimate reason for the adverse employment action.  Wright, 352 F.3d at 478.  The plaintiff, however, retains the burden to show that the reason given was a pretext.  id.

25

Hess contends that his requests for reasonable accommodations for the effects of his ADHD and anxiety annoyed and angered the District.  The District disputes Hess's claim that he asked for accommodations for his disability.  Further, the District points out that because Hess claims to have requested accommodations beginning in 1997 but did not suffer any adverse actions until after the incidents occurred in the fall of 2002 and winter of 2003, he cannot show any causal connection between his requests and his eventual termination.  In addition, the District provides a legitimate reason for its decision to terminate Hess, that is, that he failed to properly and appropriately supervise his students, which Hess has not countered with evidence of pretext.  Based on the record, Hess has not shown a triable issue on his retaliation claim.

    B.  <u>FMLA Claims</u>

"The Family and Medical Leave Act of 1993 (FMLA or Act) . . . creates a private right of action to seek both equitable relief and money damages 'against any employer' . . . 'should that employer interfere with, restrain, or deny the exercise of' FMLA rights. . . ."  <u>Nev. Dep't of Human Res. v. Hibbs</u>, 538 U.S. 721, 724 (2003) (quoting 29 U.S.C. § § 2617(a)(2) & 2615(a)(1)). Hess alleges that the District violated the FMLA by "restricting

and/or failing to grant his requests for medical leave." Am.
Compl. ¶ 62. He also alleges that the District failed to
properly notify him about his rights under the FMLA. He further
alleges that the District retaliated against him for requesting
FMLA leave.

In the motion for summary judgment, the District points out
that it granted Hess's request for FMLA leave. Then, when Hess's
attorney asked that he be allowed to use his sick time instead of
FMLA leave and be paid for the time he was out of work, the
District also granted that request, which covered the time he was
out from March 13, 2003, through the end of the year. Hess
responds by arguing that the District unlawfully assigned four
weeks to the FMLA leave when that time was "covered by a state
statute for suspension and non-renewing of teachers." Obj. at
36. He does not identify the statute. He also argues that the
District failed to provide the required notice of FMLA rights.

Even assuming the District erroneously attributed suspension
time to FMLA leave, which cannot be determined on the present
record, it remains unclear what effect such an error might have
had on Hess's right to FMLA leave, particularly because his FMLA
leave was changed to sick time at his request. With respect to
the District's failure to post or provide notice of the FMLA,
such failure may provide a cause of action only if the lack of

27

notice harmed or prejudiced the plaintiff.  See, e.g., Conoshenti
v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004);
Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 162
(2d Cir. 1999); Mion v. Aftermarket Tool & Equip. Group, 990 F.
Supp. 535, 539 (W.D. Mich. 1997).  Because Hess requested and was
granted FMLA leave, any failure to post notice of the FMLA did
not prejudice him.  Hess provides no supported argument of
retaliation.  Therefore, the District is entitled to summary
judgment on Hess's claims under the FMLA.

   C.  State Law Claims

   Hess alleges claims under the New Hampshire Laws Against
Discrimination, RSA 354-A, and other state law claims.  The
District argues that Hess's disability discrimination claims
under RSA 354-A fail for the same reasons that his claims under
the ADA fail.  See, e.g., McCusker v. Lakeview Rehab. Ctr., Inc.,
2003 WL 22143245, at *2 n.3 (D.N.H. Sept. 17, 2003).  Because
Hess's federal claims, which were the basis for jurisdiction in
this case, have been resolved against him, however, the court
declines to exercise supplemental jurisdiction over the remaining
state law claims.  28 U.S.C. § 1367(c); Gonzalez-De Blasini v.
Family Dep't, 377 F.3d 81, 89 (1st Cir. 2004).

Conclusion

For the foregoing reasons, the defendant's motion to dismiss (document no. 30) is granted.  The defendant's motion for summary judgment (document no. 29) is granted as to the plaintiff's federal claims and is terminated as to the state law claims.  The court dismisses the state law claims without prejudice for lack of subject matter jurisdiction.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 18, 2005

cc:  Daniel P. Schwarz, Esquire
     Gerald R. Hess, pro se

29